Dena C. Sharp (State Bar No. 245869)
dsharp@girardsharp.com
Adam E. Polk (State Bar No. 273000)
apolk@girardsharp.com
Nina Gliozzo (State Bar No. 333569)
ngliozzo@girardsharp.com
Samhita Collur (State Bar No. 348448)
scollur@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.W. and V.W. <br><br> Plaintiffs, <br><br> vs. <br><br> CRYOPORT, INC. <br><br> Defendant. | Case No. <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs S.W. and V.W. by and through their undersigned counsel, bring this action against Cryoport, Inc. ("Cryoport" or "Defendant") and allege as follows:

## NATURE OF THE ACTION

1. Cryoport offers comprehensive logistics services to facilitate the transportation of fragile, and oftentimes irreplaceable, human reproductive matter and other life sciences materials.

2. Plaintiffs S.W. and V.W. are a married couple who want children and underwent IVF treatments in 2019 to preserve their options and give themselves the best possible chance to grow their family. As a result of their IVF treatments, they were able to create and cryopreserve six healthy embryos.

3. Four years later, in 2023, Plaintiffs were ready to have a child and contracted with Cryoport to transport the six frozen embryos from a fertility clinic in San Francisco, California to the Fertility Center of Orange County ("FCOC") based in Irvine, California. They scheduled an appointment to attempt a pregnancy using the embryos as soon as they were delivered to FCOC.

4. Plaintiffs purchased transportation services from Cryoport. On that purchase, Cryoport became obligated to deliver Plaintiffs' embryos, intact, to FCOC for Plaintiffs' use in a scheduled embryo implantation procedure.

5. Recognizing that embryos entrusted to their care are fragile and irreplaceable, Cryoport promises to its clients, including Plaintiffs, that it uses state-of-the-art technology to ensure that "patients' materials arrive safely and securely."[1]

6. Plaintiffs' embryos were packaged and shipped on November 8, 2023. The shipping containers were clearly marked as containing live specimens.

7. The next day, on November 9, 2023, Plaintiffs received a tracking update by FedEx which purported to show that the embryos had been delivered to FCOC. Despite the

---

[1] https://www.cryoport.com/applications/reproductive-medicine/.

COMPLAINT
CASE NO.

delivery status presented in the notification, Cryoport never delivered the embryos to FCOC.

8.    Plaintiffs were later informed by Cryoport that the shipping containers with their embryos had been erroneously returned to the Cryoport logistics center located just a few miles from FCOC. In violation of Cryoport's general policy, a Cryoport employee subsequently opened the shipping container with Plaintiffs' embryos and removed all of its contents—including the storage units containing their frozen embryos.

9.    Cryopreserved materials, like embryos, must be maintained under cold temperatures while being transported to remain viable.

10.    When the Cryoport employee removed the embryos from the storage container that kept them safely frozen, the embryos were exposed to an uncontrolled thaw that destroyed them.

11.    In conversations and communications with Plaintiffs following the incident, Cryoport has admitted that the actions of its employee, in violation of company policy, caused the damage and destruction to Plaintiffs' embryos.

12.    Upon learning the news that their embryos had been damaged and destroyed, Plaintiffs' joy and anticipation for expanding their family quickly turned to devastation.

13.    Because of Cryoport's failure to protect and safeguard Plaintiffs' embryos, Plaintiffs lost irreplaceable property, and were emotionally, physically, and psychologically harmed as a result. Plaintiffs bring this action to hold Defendant accountable for its conduct.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (d)(2)(A) because Plaintiffs and Defendant are citizens of different states.

15.    This Court has personal jurisdiction over Defendants because Cryoport purposefully availed itself of the laws and benefits of doing business in California, and Plaintiffs' claims arise out of each of the Defendants' forum-related activities.

1  Furthermore, a substantial portion of the events giving rise to Plaintiffs' claims occurred
2  in this District.

3      16.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action
4  because a substantial part of the events, omissions, and acts giving rise to the claims herein
5  occurred in this District.

6                              **THE PARTIES**

7      17.    Plaintiff S.W. is a citizen of the State of California and resides in Ladera
8  Ranch, California.

9      18.    Plaintiff V.W. is a citizen of the State of California and resides in Ladera
10  Ranch, California.

11      19.    Defendant Cryoport, Inc. is a Nevada company with its principal place of
12  business at 112 Westwood Place, Suite 350 Brentwood, Tennessee 37027.

13                         **FACTUAL ALLEGATIONS**

14  **I.    Cryoport Specializes in the Transportation of Fragile Human Reproductive**
15       **Materials**

16      20.    Cryoport Systems, a division of Cryoport, Inc. specializes in transportation
17  solutions for precious, fragile, and irreplaceable life sciences materials, including human
18  reproductive matter. Entities who seek to transport life sciences materials rely on
19  Cryoport's services for safe and secure transportation of their goods.

20      21.    Cryoport represents itself as a "global leader in supply chain solutions" for
21  the life sciences industry and purports to have built "the only premier temperature-
22  controlled shipping systems in the industry that adhere to ISO 21973 standards."[2]

23      22.    Reproductive materials, antibiotics, cell cultures, and other life sciences
24  materials often require temperature-controlled environments when they are transported
25  from one location to another. To meet this need, Cryoport has designed transportation

26
27
28
---
[2] https://www.cryoport.com/; https://www.cryoport.com/solutions/shipping-systems/.

3

COMPLAINT
CASE NO.

infrastructure that includes "advanced temperature-controlled packaging, informatics, specialized bio-logistics services, bio-storage, bio-services, and cryogenic systems."[3]

23.   Cryostork, a branch of Cryoport Systems, specializes in the provision of transportation solutions for fertility clinics and other entities operating in the human reproductive market seeking to transport human reproductive materials, including eggs, sperm, and embryos. Cryoport has substantial experience transporting these materials, and the company's website notes that "90% of U.S. fertility clinics have worked with Cryoport Systems."[4]

24.   Human reproductive materials are transported using cryogenic storage systems, which are specialty units designed to maintain extremely low temperatures in order to preserve the materials. Human reproductive materials *must* be maintained at cryogenic (sufficiently low) temperatures to keep the materials frozen. To achieve this, Cryoport transfers reproductive material like human embryos in dewars containing liquid nitrogen. The embryos must remain submerged in the liquid nitrogen throughout transportation to remain safely frozen.

25.   Cryoport recognizes that maintaining cryogenic temperatures during the transport of reproductive tissues is "critical for cell integrity to retain viability, stabilize the cells, and ensure reproducible results and successful IVF treatment,"[5] and represents that its shipping containers can sustain cryogenic temperatures for up to ten days.[6] Cryoport further represents that "all of our staff involved in the packaging and shipping process is highly trained to handle reproductive materials specifically."[7]

---

[3] Cryoport 10-K (March 13, 2024) at 4, available at https://ir.cryoportinc.com/sec-filings/all-sec-filings/content/0001558370-24-003128/cyrx-20231231x10k.htm.

[4] https://www.cryoport.com/applications/reproductive-medicine/clinics/.

[5] *Supra* note 3, at 9.

[6] https://www.cryoport.com/what-you-need-to-know-about-shipping-your-reproductive-materials/.

[7] *Id.*

COMPLAINT
CASE NO.

26.    Frozen human reproductive materials must be thawed in a controlled environment to remain viable for use in the future. This controlled process generally involves immersing the tissues in a warm fluid that removes the cryoprotectant substance used to keep the materials frozen. The materials are then immediately placed in an incubator, which allows the materials to properly settle.

27.    Human reproductive materials that are inadvertently exposed to outside elements beyond the controlled environment face the risk of damage and destruction. Cryoport recognizes the heavy responsibility it bears in ensuring the safe transport of human reproductive materials. The company's website underscores the "the criticality and responsibility involved in the management of valuable materials for the life sciences" and recognizes that the reproductive materials being transported in its units are "irreplaceable."[8]

## II.    In Vitro Fertilization Procedure

28.    IVF has become an established means of allowing individuals and couples the opportunity to become pregnant using their biological material. IVF provides the flexibility to begin a family when it makes sense for individuals and couples personally and professionally. IVF is also a way for those suffering from infertility to start their families, using their own biological material.

29.    An IVF cycle typically includes the following steps or procedures: (1) the patient takes medications, including regular injections of hormones, to grow multiple eggs; (2) the clinic retrieves the patient's eggs from the ovary or ovaries; (3) the eggs are inseminated with sperm; (4) the clinic cultures any resulting fertilized eggs, fostering their development into embryos, including with the use of culture media; (5) one or more embryo(s) are placed ("transferred") into the patient's uterus; and (6) the patient takes additional hormones to support of the uterine lining to permit and sustain pregnancy.

---

[8] https://www.cryoport.com/about-us/.

COMPLAINT
CASE NO.

30.     In certain cases, additional procedures may be employed, including (1) intracytoplasmic sperm injection ("ICSI") to increase the chance for fertilization; (2) assisted hatching of embryos to potentially increase the chance of embryo attachment ("implantation"); and (3) cryopreservation (freezing) of eggs or embryos.

31.     The success of IVF largely depends on growing multiple eggs at once and then retrieving the eggs (egg retrieval process). To achieve this goal, patients undergo a strict regimen of injections with hormones and other medicines. These injections can cause a plethora of known side effects, including but not limited to bruising, redness, swelling, or discomfort at the injection site, bloating, weight gain, water retention, bone loss, fatigue, headaches, muscle aches, abdominal pain, breast tenderness, vaginal yeast infections, vaginal dryness, bone loss, hot flashes, mood swings, depression, nausea, vomiting, diarrhea, clots in blood vessels and strokes. Women injected with these pharmaceuticals also run the risk of a potentially fatal allergic reaction to the drugs. And up to 2% of women will develop Ovarian Hyperstimulation Syndrome ("OHSS"), a life-threatening condition that can cause increased ovarian size, nausea and vomiting, accumulation of fluid in the abdomen, breathing difficulties, increased concentration of red blood cells, kidney and liver problems, blood clots, kidney failure, and death.

32.     IVF requires multiple doctor visits involving routine blood tests and invasive transvaginal ultrasound examinations, which are often scheduled with very little advanced warning. IVF also places restrictions on diet, work, and travel.

33.     The egg retrieval process itself involves surgery conducted under anesthesia, where the eggs are extracted with a large needle inserted through the vaginal wall. Risks of the egg retrieval procedure include infection, bleeding, trauma to intra-abdominal organs, allergic reactions, low blood pressure, nausea, vomiting, and in rare cases, death. After the retrieval procedure, a patient often experiences residual pain for about a week and may need bedrest for several days.

34.     Another potential risk is that the procedure will fail to obtain any eggs, or the eggs may be abnormal or of poor quality and otherwise fail to produce a viable pregnancy.

35.     Based on their age and medical status, women may undergo multiple rounds of retrievals to obtain enough eggs or embryos to achieve their reproductive goals. This process can take months or even years. On average, women and couples spend $40,000-$60,000 out of pocket for these services.

36.     If and when viable eggs are retrieved, IVF and embryo culture occurs. Sperm and eggs are placed together in specialized conditions (culture media, controlled temperature, humidity, and light) to achieve fertilization. Sperm and eggs are submerged in culture media, which is a nutrient-rich liquid designed to promote the growth and development of a fertilized egg into a viable embryo by replicating the natural environment and fluids in a woman's reproductive system. When they develop successfully, embryos grow and reach certain milestones for viability over the course of several days following insemination.

37.     After the egg retrieval process, IVF patients can either receive a fresh embryo transfer or a frozen embryo transfer. A fresh transfer occurs after a few days of embryo development. Embryos are selected for transfer and are placed in the uterine cavity with a tube. By contrast, a frozen transfer involves cryogenically freezing the embryo, then after a period of time, thawing the embryo under tightly controlled conditions to maintain its viability, and placing it in the patient's uterus. Frozen transfers allow a patient to elect to genetically screen the embryos to determine if any suffer from genetic abnormalities making them unsuitable for transfer.

38.     If multiple viable embryos are created in an IVF cycle, patients can opt to do a fresh transfer of one or more embryos and freeze others for later transfer attempts. Excess embryos of sufficient quality that are not transferred can be frozen. So long as they are properly stored, frozen embryos can remain viable and be transferred years after they are retrieved.

## III.    The Loss of Eggs and Embryos Has Severe Consequences

39.     People who engage in fertility services make large monetary and emotional investments. They endure painful and invasive procedures, financial stress, and the strain

COMPLAINT
CASE NO.

the process puts on their mental health and relationships with others, all in the hopes that one day they will be able to have a child.

40.    In addition to the physical burdens of IVF, the process is also emotionally grueling. The success or failure of IVF, including egg retrieval and embryo storage, has substantial emotional and psychological ramifications for those seeking to become parents.

41.    For many, the IVF process represents their last hope for having children. Many women experience and express strong feelings of anxiety, failure, hopelessness, and disappointment during this process. The IVF process can affect a patient and her spouse or partner medically, financially, socially, emotionally, and psychologically. Feelings of anxiety, depression, isolation, and helplessness are not uncommon in patients undergoing IVF. Losing eggs and embryos provokes fear, devastation, and despair. Many people experience grief and anguish when fertility treatment does not result in pregnancy or when they lose fertility choices.

42.    As discussed above, women take drug and hormone cocktails and injections over several weeks to stabilize the uterine lining, stimulate ovaries into producing follicles, and stop these ovary follicles from releasing eggs. A woman may be subjected to multiple injections each day, resulting in bruising, swelling, and discomfort. The drug and hormone therapy may also trigger other side effects, such as tiredness, nausea, headaches, and blood clots, as well as negative emotions. The process can limit travel and other activities, entails numerous doctor visits, and often requires time off from work. The retrieval procedure itself requires anesthesia, as well as insertion of a thick needle through the vaginal wall to drain the ovary follicles of their fluid. After the procedure, a woman often experiences residual pain for about a week and may need bed rest for several days. Some women suffer significant side effects, such as ovarian hyperstimulation syndrome, requiring hospitalization.

43.    These invasive services are expensive. According to recent estimates, "a single IVF cycle—defined as ovarian stimulation, egg retrieval and embryo transfer—can range from $15,000 to $30,000, depending on the center and the patient's individual

medication needs."[9] Clients typically pay thousands of dollars for fertility drugs leading up to egg retrieval and may also spend hundreds of dollars on acupuncture and other services recommended to them to improve outcomes. Depending on age and health status, some women will undergo (and pay for) more than one IVF cycle, or if they freeze multiple embryos, will pay thousands of dollars for each transfer attempted with an existing embryo.

44.    As a provider who specializes in transporting cryogenically frozen reproductive material, Cryoport is aware of the lengths to which people go to obtain eggs and create embryos, how much they mean to patients, the patients' emotional (and financial) investment in the survival of the eggs and embryos, and the patients' expectations that great care will be taken to preserve and protect the eggs and embryos to avoid irreparable, devastating harm.

45.    Eggs and embryos are precious. They offer the opportunity to fulfill one of the most fundamental human urges: to become a parent and create one's own family when the time is right. Eggs and embryos are also irreplaceable. The most determinative factor in IVF success is the woman's age at the time her eggs were extracted. At some point, usually around her mid-40s, a woman can no longer produce viable eggs, and eggs from older women are less likely to produce a viable pregnancy and healthy child. When preserved eggs or embryos are damaged or compromised, it may be impossible for clients to build their family as they had planned.

**IV.    Plaintiffs' Embryos Were Destroyed Because of Defendants' Conduct**

46.    In September 2019, V.W. (then age 35) and S.W. (then age 33) began the process of creating embryos to maximize their fertility options. Plaintiffs created and cryopreserved six healthy embryos at the University of California San Francisco Center for Reproductive Health ("UCSF") while living in the San Francisco Bay Area.

---

[9] https://www.forbes.com/health/womens-health/how-much-does-ivf-cost/.

COMPLAINT
CASE NO.

47.    Each of the six embryos was euploid, healthy, and viable. They were graded 5AA, 5AA, 5AA, 5BA, 4AA, and 5BC. All were genetically tested and had no abnormalities.

48.    Plaintiffs subsequently moved to Southern California, and continued their fertility care at a new clinic, FCOC, based in Irvine, California,

49.    In 2023, Plaintiffs prepared to use their embryos and expand their family. They scheduled an implantation at FCOC on December 21, 2023. To prepare for the implantation, they underwent the required testing and examinations and contacted Cryoport to arrange for the transportation of their six frozen embryos from UCSF to FCOC.

50.    Cryoport provided a quote to Plaintiffs on October 3, 2023 and represented that it could provide "exclusive fertility shipping services, along with reassurance and support." The services advertised as included in the standard transport services package included "The Client Care Team utilizes our Logistics Management Platform to continuously collect and monitor data throughout the entire transport" and "Smartpak® Condition Monitoring System: Tracks GPS location and temperature."

51.    On October 23, 2023, Plaintiffs purchased Cryoport's quoted transportation services to transport their six frozen embryos from San Francisco to Irvine.

52.    On November 8, 2023, Plaintiffs' six healthy frozen embryos were packaged in Cryoport's transportation dewar at UCSF. The packages were clearly labeled as containing live specimens.

53.    Cryoport provided the transportation dewar and was responsible for coordinating the transportation but contracted with FedEx to physically take the dewar from UCSF to FCOC.

54.    Over the course of the next few days, Plaintiffs received tracking updates from FedEx confirming that the embryos were en route to the delivery address, which was correctly listed for FCOC.

COMPLAINT
CASE NO.

55.    On Thursday, November 9, 2023, Plaintiffs received a tracking update that purported to show that the embryos had been delivered to FCOC, but the space to indicate who had signed for the shipment was blank.

56.    That same day, FCOC contacted Cryoport to report that, despite the delivery confirmation email, it had not received Plaintiffs' embryos.

57.    It was not until the next day, November 10, 2023, that Cryoport revealed to Plaintiffs and FCOC the detail of what had happened.

58.    According to Cryoport, the shipping container had instead been erroneously delivered to Cryoport's logistics center located just a couple miles away from FCOC. Cryoport also informed Plaintiffs that after the shipping container reached Cryoport's facility, a Cryoport employee opened the container with Plaintiffs' embryos and removed all of its contents—including the storage units containing their frozen embryos. The embryos were eventually placed back into a shipping container and delivered to FCOC in a damaged or destroyed state.

59.    Cryoport further confirmed that the shipping container with Plaintiffs' embryos was clearly marked as containing live specimens, and that Cryoport's policy is to never open containers that contain live specimens, but instead for staff to immediately elevate the presence of such a shipping container at the logistics center.

60.    Cryoport provided temperature stability reports to Plaintiffs—designed to ensure the safe transportation of frozen material—which are consistent with the timeline alleged above. The first report contains temperature readings for the storage container from November 6 to November 9, 2023. The log ends at approximately 19:00 UTC, or 1:00pm local time, which is around the reported time that Cryoport removed the contents of the dewar. Although Cryoport has not confirmed precisely when Plaintiffs' embryos were placed back into a dewar after they were discovered, the next temperature stability report does not report any temperature readings until just before November 11 at 00:00 UCT, or November 10 at 4:00pm local time.

61.    Cryoport has acknowledged that Plaintiffs' embryos were damaged and destroyed as a result of its employee. Cryoport admitted these facts on phone calls with Plaintiffs and in other materials provided to Plaintiffs and also expressed condolences to Plaintiffs for the loss of their embryos. All of Plaintiffs' embryos were destroyed due to Cryoport's failure to safely and securely transport and deliver Plaintiffs' embryos to FCOC.

62.    At Plaintiffs' request, FCOC thawed and examined the embryos to see if any could still be used to attempt a pregnancy. This testing confirmed that the embryos were destroyed and no longer viable. FCOC's report describes that each of the embryos were "filled with bubbles" and degenerated. None survived.

63.    As Plaintiffs grieved their loss following Cryoport's destruction of their six embryos, they still longed to grow their family, though V.W. is now 40 years old. They were able to achieve a pregnancy in January 2024 but learned in February and confirmed in March that the baby had Trisomy 18, a rare genetic condition associated with major congenital abnormalities and more common for mothers of advanced maternal age. They saw an obstetrician specializing in high-risk pregnancies who confirmed that the baby's defects were fatal and the pregnancy nonviable. Plaintiffs were and remain completely devastated. They had planned ahead and frozen embryos to avoid genetic issues, but because of Cryoport, their embryos were not available when they needed them.

**V.    Cryoport Makes Several Public Representations About the Quality of its Services**

64.    Before and at the time Plaintiffs purchased transportation services from Cryoport, Cryoport held itself out as a gold standard transportation company with state-of-the-art technology and emphasized that human reproductive materials would be safely transported to its customer's desired destination.

65.    The below representations can all be found on Cryoport's website and existed there prior to Plaintiffs' purchase of Cryoport's transportation services:

    a.    "We incorporate state-of-the-art informatics and data monitoring technology into our systems to provide near-real time traceability.

Clients trust us because our processes are proven to maintain both Good Manufacturing Practice (GMP) and Good Distribution Practice (GDP) standards no matter the material type."[10]

b.    "At Cryoport Systems, we are dedicated to **setting the industry standard for quality and safety** in the temperature-controlled supply chain. Our comprehensive approach to risk mitigation ensures the highest level of reliability across our entire platform of supply chain solutions."[11]

c.    "From our precision-engineered shipping systems that offer meticulous attention to detail for the safe transport of sensitive materials to our transportation and logistics solutions that are designed to proactively mitigate risk, we are dedicated to ensuring the integrity of your temperature-controlled supply chain at every stage."[12]

d.    "Our exclusive courier services are the most reliable on the market, and our cutting-edge technology, equipment, and standardized procedures ensure that patient materials arrive safely and securely."[13]

e.    "At Cryoport Systems, we understand the criticality and responsibility involved in the management of valuable materials for the life sciences. In many cases, we're dealing with irreplaceable therapies, vaccines, research materials, and reproductive materials for our clients and partners.[14]

---

[10] https://www.cryoport.com/solutions/shipping-systems/.

[11] https://www.cryoport.com/about-us/quality/.

[12] *Id.*

[13] https://www.cryoport.com/applications/reproductive-medicine/.

[14] https://www.cryoport.com/about-us/.

13

COMPLAINT
CASE NO.

f.   "Cryoport Systems sets the standard for quality and safety in the temperature-controlled supply chain."[15]

g.   "All of our staff involved in the packaging and shipping process is highly trained to handle reproductive materials specifically."[16]

66.   In addition to the website representations, Cryoport made similar representations on the quote for services provided to Plaintiffs, titled "Cryoport Systems Shipping Quote," including

a.   "Cryoport Systems is pleased to offer you our exclusive fertility shipping services, along with reassurance and support as you take the next step towards building your family."

b.   "The Client Care Team utilizes our Logistics Management Platform to continuously collect and monitor data throughout the entire transport."

67.   Plaintiffs reviewed Cryoport's website and order form prior to deciding to hire them to provide transportation services, and relied on Cryoport's statements regarding the quality of their services.

## COUNT I

### Bailment

68.   Plaintiffs repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

69.   Plaintiffs incorporate the above and below allegations by reference.

70.   Plaintiffs delivered to Cryoport for safekeeping irreplaceable personal property to be safely and securely kept for the benefit of Plaintiffs, and to be redelivered to them upon demand.

71.   Cryoport received Plaintiffs' embryos on this condition.

---

[15] https://www.cryoport.com/about-us/quality/.

[16] https://www.cryoport.com/what-you-need-to-know-about-shipping-your-reproductive-materials/.

COMPLAINT
CASE NO.

72.     Plaintiffs agreed to pay, and did pay, substantial sums in exchange for Cryoport's promise to safeguard reproductive material for the benefit of Plaintiffs.

73.     Plaintiffs gave Cryoport exclusive possession and control of Plaintiffs' invaluable personal property (i.e., the embryos). Cryoport knowingly accepted Plaintiffs' invaluable personal property (i.e., the embryos).

74.     Cryoport had a duty to exercise care in maintaining, preserving, and protecting Plaintiffs' embryos that were delivered to Cryoport. Further, Cryoport had a duty to return the embryos, undamaged, to Plaintiffs, to whom the embryos belonged, including by delivering them to Plaintiffs' designated recipient fertility clinic.

75.     Cryoport invited the general public, including Plaintiffs, to entrust eggs and embryos to Cryoport's care by holding out Cryoport as a competent, capable, and established reproductive and storage facility able to handle and care for eggs and embryos in a safe and satisfactory manner, and in a manner specified on their websites.

76.     Because of Cryoport's wrongful conduct, as set forth herein, the irreplaceable property of Plaintiffs was destroyed, precluding its redelivery to them.

77.     Cryoport breached their duty to exercise care in the safekeeping of Plaintiffs' embryos delivered to Cryoport and to return the embryos, undamaged, to Plaintiffs.

78.     As a direct and proximate result of Cryoport's breach of bailment contract, Plaintiffs have been deprived of the opportunity to use the embryos they entrusted to Cryoport and have suffered damages in an amount to be determined at trial.

## COUNT II

### Negligence and/or Gross Negligence

79.     Plaintiffs incorporate the above and below allegations by reference.

80.     Cryoport owed Plaintiffs a duty to exercise the highest degree of care when transporting, handling, and monitoring the temperature-controlled storage units used to transport Plaintiffs' embryos.

81.     Cryoport owed a duty of care to Plaintiffs to act reasonably in all aspects of the handling and transport of Plaintiffs' embryo so as to avoid destroying them, damaging

COMPLAINT

CASE NO.

them, or jeopardizing their viability given that doing so would inevitably lead to the loss of invaluable property, physical, and emotional distress.

82. Cryoport assumed that duty of care through communications with Plaintiffs and by reason of Cryoport's special relationship with Plaintiffs arising from the sensitive services Cryoport undertook to perform—transporting fragile and irreplaceable reproductive materials.

83. Plaintiffs' harm occurred in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious harm. As Cryoport states in its marketing, the company is "dedicated to setting the industry standard for quality and safety in the temperature-controlled supply chain" and offers "the most reliable [courier service] on the market" designed to "ensure that patient materials arrive safely and securely."

84. It was reasonably foreseeable to Cryoport that Plaintiffs would experience economic loss and severe emotional distress as a result of Cryoport's breach of its duty of care.

85. Cryoport's carelessness and gross negligence directly and foreseeably damaged Plaintiffs. Plaintiffs entrusted Cryoport with transporting, handling, and monitoring their invaluable embryos, and Cryoport's mishandling of their embryos naturally and foreseeably caused economic loss, mental anguish, and emotional distress, among other injuries, to Plaintiffs.

86. There was a close connection between Cryoport's conduct and Plaintiffs' injuries. Plaintiffs' economic loss, emotional distress, and other harms occurred because of Cryoport's failure to act reasonably in all aspects of the transportation, handling, and monitoring of Plaintiffs' embryos.

87. Plaintiffs entrusted Cryoport to use reasonable care to safeguard their embryos to preserve their reproductive options. Cryoport's carelessness with this precious material, and ultimately, with Plaintiffs' careful plans for parenthood, is reprehensible.

COMPLAINT
CASE NO.

88.    Cryoport is a common carrier. A common carrier generally has a duty to act as an insurer for the goods it transports.

89.    Imposing a duty on Cryoport to avoid causing emotional distress and loss of invaluable property would promote the policy of preventing future harm, insofar as it will be motivated to implement more effective processes and systems to ensure that eggs and embryos are transported safely going forward. Imposing a duty on Cryoport to avoid causing emotional distress also furthers the community's interest in ensuring that reliable fertility services are available to those who wish to become parents.

90.    The burden on Cryoport from a duty to avoid causing economic loss and emotional distress is fair and appropriate in light of the importance of the eggs and embryos it voluntarily agreed to protect, at considerable cost to Plaintiffs.

91.    Cryoport owed Plaintiffs a non-delegable duty of care with respect to the maintenance and protection of the embryos entrusted to their care.

a.    Cryoport breached these duties and acted with negligence and gross negligence in at least the following respects:

b.    failing to properly safeguard the embryos in its care;

c.    failing to follow Cryoport's own policies and procedures for handling transportation containers with live specimens;

d.    failing to adequately monitor the location of the storage unit containing Plaintiffs' embryos;

e.    failing to properly train and supervise staff responsible for the cleaning and maintenance of storage units.

f.    failing to disclose that it did not have appropriate processes and systems in place to protect Plaintiffs' embryos.

92.    Cryoport's acts and omissions constitute gross negligence because they constitute an extreme departure from what a reasonably careful person would do in the same situation to prevent foreseeable loss of embryos.

93.    Cryoport acted willfully, wantonly, and with conscious and reckless disregard for the rights and interests of Plaintiffs. Cryoport's acts and omissions had a great probability of causing significant harm and in fact did cause such harm—the loss of Plaintiffs' invaluable property.

94.    As a proximate result of Cryoport's negligence and/or gross negligence, Plaintiffs suffered economic loss in an amount to be determined at trial, including the loss of irreplaceable and invaluable property. A reasonable person would be unable to cope with the losses suffered by Plaintiffs.

95.    As a proximate result of Cryoport's negligence, Plaintiffs suffered harm in an amount to be determined at trial, including economic loss and severe emotional distress consisting of shock, fright, horror, anguish, suffering, grief, anxiety, nervousness, embarrassment, humiliation, and shame.

96.    The foregoing acts were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights, interests, and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
### Conversion

97.    Plaintiffs incorporate the above and below allegations by reference.

98.    Plaintiffs owned and had the right to possess their embryos, which are unique items of personal property.

99.    Cryoport substantially interfered with Plaintiffs' embryos by intentionally failing to properly maintain the frozen embryos in a safe environment, removing them from the transportation dewar, and exposing them to an uncontrolled thaw, which was a substantial factor in the destruction of Plaintiffs' embryos. Cryoport knew, or should have known, that removing the embryos from the transportation dewar would destroy the embryos.

COMPLAINT
CASE NO.

100.    Plaintiffs did not consent to their embryos being destroyed. Plaintiffs were harmed when their embryos were destroyed; they lost invaluable property that could have enabled them to have a child and were emotionally and physically harmed.

## COUNT IV

### Trespass to Chattels

101.    Plaintiffs incorporate the above and below allegations by reference.

102.    Plaintiffs owned or had the right to possess their reproductive material—their six frozen embryos—that was destroyed by Cryoport's mishandling of Plaintiffs' embryos.

103.    Cryoport intentionally interfered with Plaintiffs' possession of their embryos by removing them from the transportation dewar, and by failing to safely and securely transport and deliver Plaintiffs' six frozen embryos to FCOC so Plaintiffs could use the embryos to grow their family.

104.    Plaintiffs did not consent to or authorize the damage and destruction to their embryos as a result of Cryoport's failure to safely and securely transport and deliver Plaintiffs' embryos.

105.    Defendant caused physical damage to Plaintiffs' personal property when it failed to safely and securely transport Plaintiffs' embryos.

## COUNT V

### Violation of Consumers Legal Remedies Act ("CLRA")

### Cal. Civ. Code. §§ 1750, et seq.

106.    Plaintiffs incorporate the above and below allegations by reference.

107.    Cryoport is a "person" under Cal. Civ. Code § 1761(c).

108.    Plaintiffs are "consumers" under Cal. Civ. Code § 1761(d).

109.    Plaintiffs' purchase of Defendants' services constitute "transactions" under Cal. Civ. Code § 1761(e).

110.    Defendants' services are "services" under Cal. Civ. Code § 1761 (a-b).

COMPLAINT
CASE NO.

111.   The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

112.   As alleged herein, Defendants have engaged in unfair or deceptive acts or practices in violation of the CLRA, Cal. Civ. Code § 1750, *et seq.* by, among other things, representing that Defendants' services have characteristics, uses, benefits, and qualities which they do not have; representing that their services are of a particular standard, quality, and grade when they are not; and advertising their services with the intent not to sell them as advertised.  Cal Civ. Code § 1770 (5), (7), and (9).

113.   Defendants actively failed to disclose and concealed material facts about their services, and otherwise engaged in activities with a tendency or capacity to deceive a substantial portion of the purchasing public, as described herein.

114.   Defendants could have readily disclosed the entire truth regarding the risks connected to its services to Plaintiffs through various sources, including its website and marketing materials.

115.   Defendants' CLRA violations materially affected the decisions of Plaintiffs. Plaintiffs reasonably relied upon Defendant's material omissions and partial claims regarding the quality of their services and would not have purchased those services had they known the truth.

116.   As a result of the CLRA violations described herein, Plaintiffs have suffered actual damages.

117.   Pursuant to Cal. Civ. Code § 1780, Plaintiffs seek recovery of attorneys' fees and costs, and injunctive relief for Defendants' violations of the CLRA.

118.   Venue is proper under California Civil Code § 1780(d) because Cryoport does business in Orange County where a substantial portion of the acts and omissions at issue occurred. The CLRA venue declaration is attached as **Exhibit 1** to this complaint.

119.   At this time, Plaintiffs only seek injunctive relief under the CLRA. On July 8, 2024, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all

COMPLAINT
CASE NO.

respects with California Civil Code § 1782(a). The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. Plaintiffs reserve the right to amend their complaint to add a claim for compensatory and punitive damages under the CLRA if Defendants fail to correct their business practices or provide the requested relief within 30 days.

**COUNT VI**

**Violation of California Unfair Competition Law ("UCL")**

**Cal. Bus. & Prof. Code § 17200 *et seq*.**

120. Plaintiffs incorporate the above and below allegations by reference.

121. The UCL prohibits acts of "unfair competition," including any "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…." Cal. Bus. & Prof. Code § 17200. 125.

122. Cryoport violated each of the UCL's provisions: it acted in an unlawful, unfair, and fraudulent manner, including disseminating unfair, deceptive, untrue or misleading advertising…."

123. Defendant Cryoport is a "person" under Cal. Bus. & Prof. Code § 17201.

124. Cryoport acted unlawfully. Section 17200's "unlawful" prong "borrows violations of other laws … and makes those unlawful practices actionable under the UCL" *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1383 (2012), as modified on denial of reh'g (Feb. 24, 2012. '[V]irtually any law or regulation—federal or state, statutory or common law—can serve as [a] predicate for a … [section] 17200 'unlawful' violation." *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 681 (2006) (internal citations omitted). Cryoport violated the law through its gross negligence, bailment violations, trespass to chattels, conversion, and CLRA violations. See *supra* Claims 1–5.

125. Cryoport also acted unfairly and fraudulently through its unfair, deceptive, untrue or misleading advertising and representations to Plaintiffs and the public.

126. Unfair, deceptive, untrue, or misleading advertising under the UCL means:

21

COMPLAINT

CASE NO.

For any person, ...corporation ... or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . .or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . before the public in this state, . . . in any newspaper or other publication . . . or in any other manner or means whatever . . . any statement, concerning that real or personal property or those services . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading....

Cal. Bus. & Prof. Code § 17500.

127.   Cryoport's conduct is unfair and fraudulent in violation of the UCL because it is immoral, unethical, unscrupulous, oppressive, and substantially injurious.

128.   Cryoport voluntarily took responsibility for safeguarding Plaintiffs' embryos, and misled Plaintiffs and the public concerning the services it provided, specifically in the quality of care it would use to safely transport eggs and embryos. In particular, Cryoport advertised on its website the following misleading or untrue statements:

a.     "We incorporate state-of-the-art informatics and data monitoring technology into our systems to provide near-real time traceability. Clients trust us because our processes are proven to maintain both Good Manufacturing Practice (GMP) and Good Distribution Practice (GDP) standards no matter the material type."

b.     "At Cryoport Systems, we are dedicated to setting the industry standard for quality and safety in the temperature-controlled supply chain. Our comprehensive approach to risk mitigation ensures the highest level of reliability across our entire platform of supply chain solutions."

c.     With our platform of scalable, risk-mitigation solutions, innovative technology, and dedicated team of people, Cryoport Systems is committed to going above and beyond to enable the outcomes for the advancing life sciences industry."

COMPLAINT
CASE NO.

d.    "Our exclusive courier services are the most reliable on the market, and our cutting-edge technology, equipment, and standardized procedures ensure that patient materials arrive safely and securely."

e.    "At Cryoport Systems, we understand the criticality and responsibility involved in the management of valuable materials for the life sciences. In many cases, we're dealing with irreplaceable therapies, vaccines, research materials, and reproductive materials for our clients and partners.

f.    "Cryoport Systems sets the standard for quality and safety in the temperature-controlled supply chain"

129.    Cryoport knew or should have known through the exercise of reasonable care that these statements were untrue or misleading. For example, Cryoport represented to Plaintiffs and the public that their courier services are "the most reliable on the market," which was demonstrably untrue given the loss of Plaintiffs' embryos, and there is no evidence that Cryoport had the procedures in place to verify that this statement was true.

130.    The gravity of the harm resulting from Cryoport's unlawful, unfair, and fraudulent conduct outweighs any potential utility of the conduct. There are reasonably available alternatives that would further Cryoport's business interests, such as implementing standardized procedures to ensure safe delivery of the property entrusted to it and properly training employees, and not misrepresenting the procedures and protections in place to protect Plaintiffs' embryos.

131.    The harm from Cryoport's unlawful, unfair, and fraudulent conduct was not reasonably avoidable by Plaintiffs. Plaintiffs had no reasonable means of discovering the inadequacies in Cryoport's procedures to handle the transport of human reproductive materials.

132.    As a direct and proximate result of Cryoport's unlawful, unfair, and fraudulent conduct, Plaintiffs have lost invaluable property, their embryos, which are treated as property under California law. Plaintiffs also lost money, including the money spent on

their IVF treatment, testing to confirm the embryos were destroyed, and costs related to the genetic testing of their subsequent pregnancy.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court enter judgment against Defendant through an order:

a. Declaring that the Defendant's conduct violates the laws and standards referenced above;

b. Finding in favor of Plaintiffs on all counts asserted herein;

c. Granting Plaintiffs compensatory, restitutionary, rescissory, general, consequential, punitive damages and/or exemplary damages in an amount to be determined at trial;

d. Awarding prejudgment and post-judgment interest on all amounts awarded to the fullest extent allowed under the law;

e. Awarding Plaintiffs their reasonable attorneys' fees, expenses, and costs of suit as permitted by law; and

f. Such other and further relief as the Court deems necessary or appropriate.

### **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims and issues so triable.

COMPLAINT

CASE NO.

Dated: July 18, 2024

Respectfully submitted,

/s/ *Adam E. Polk*

Dena C. Sharp (State Bar No. 245869)
dsharp@girardsharp.com
Adam E. Polk (State Bar No. 273000)
apolk@girardsharp.com
Nina Gliozzo (State Bar No. 333569)
ngliozzo@girardsharp.com
Samhita Collur (State Bar No. 348448)
scollur@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Attorneys for Plaintiffs*

COMPLAINT
CASE NO.